In re ENRON CORP., et al.,
Reorganized Debtors.

Enron Power Marketing, Inc., Plaintiff,

v.

Public Utility District No. 1
of Snohomish County,
Defendant.

Bankruptcy No. 01–16034 (AJG).
Adversary No. 03–02064 (AJG).

United States Bankruptcy Court,
S.D. New York.

March 9, 2007.

494

Cadwalader, Wickersham & Taft LLP by Mark C. Ellenberg, Esq., of Counsel, Washington, DC, and by Israel Dahan, Esq., of Counsel, New York, NY, Special Counsel for the Reorganized Debtors.

Weil, Gotshal & Manges LLP by Peter Gruenberger, Esq., Jonathan D. Polkes, Esq., of Counsel, New York, NY, Counsel for the Reorganized Debtors.

Public Utility District No. 1 of Snohomish County, Washington by Michael Gianunzio, Esq., Eric Christensen, Esq., of Counsel, Everett, WA.

Moses & Singer by Alan Kolod, Esq., Alan E. Gamza, Esq., Philippe Zimmerman, Esq., of Counsel, New York, NY.

Law Offices of Michael A. Goldfarb by Michael A. Goldfarb, Esq., Jeffrey Maxwell, Esq., of Counsel, Seattle, WA.

OPINION CONCERNING PLAINTIFF ENRON POWER MARKETING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CONCERNING PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY'S CROSS–MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

This adversary proceeding primarily concerns state law claims arising from an agreement, subject to the filed-rate doctrine, for the purchase or sale of wholesale electric power. That contract provides that a party may declare an early termination of the contract upon the occurrence of certain, specified default events. The contract also provides that, in the event of early termination, a termination payment will be calculated based upon the difference between the contract rate and the market rate. The entitlement to the termination payment is not dependant on the party's status as the defaulting or non-defaulting party.

In addition, the underlying contract rate and issues related to that rate are them-

selves the subject of current proceedings pending before the Federal Energy Regulatory Commission ("FERC"), which has exclusive jurisdiction over wholesale electric power rates.

As a threshold matter, the Court is asked to defer its ruling on the state law claims pending resolution of the proceedings currently before FERC. The Court denies that request. To the extent that request is based upon the doctrine of primary jurisdiction, the Court concludes that the doctrine of primary jurisdiction is not implicated here, as the state law claims are not within FERC's particular expertise; indeed, FERC itself ordinarily declines to address state law contract issues. In addition, the Court need not await a determination from FERC as to the validity of the contract rates, as the filed-rate doctrine requires that contracts be enforced in accordance with the contractual rates unless and until those rates are set aside. Similarly, the resolution of the issues presented here will not bar FERC proceedings regarding the regulatory issues before it, and any FERC rulings that revise the contract rates or otherwise impact the parties' rights and responsibilities will be appropriately implemented in accordance with relevant law.

The parties also raise issues concerning the contract's arbitration clause. The Court is first asked to determine whether it has the authority to adjudicate the enforceability of that clause, or whether only FERC can make that determination. The Court concludes that FERC would have exclusive jurisdiction where the issue concerns the enforceability of the arbitration clause *per se*. However, the Court also concludes that where, as here, the issue concerns waiver of the right to exercise an arbitration clause, and where the alleged waiver is founded upon prior litigation of the issues sought to be arbitrated, the

Court does have jurisdiction to consider the issue. Nonetheless, having considered the issue, the Court concludes that sufficient prejudice to establish waiver has not been shown.

Finally, the Court is asked to determine whether this matter is a core proceeding and whether arbitration of the issues presented here would conflict with the objectives of the Bankruptcy Code. The Court assumes that this matter is a core proceeding, but concludes that pursuing arbitration would not jeopardize objectives of the Bankruptcy Code nor would the Code provisions inherently conflict with the Federal Arbitration Act (the "FAA"). Thus, the Court concludes that the arbitration clause should be enforced and the state law claims raised in this adversary proceeding arbitrated.

*Facts*

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corp. and certain of its affiliated entities, including Enron Power Marketing, Inc. ("EPMI" and collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order (the "Confirmation Order") confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004 and, pursuant to section 1.232 of the Plan, from and after the effective date of the Plan, the Debtors are the Reorganized Debtors.

Prior to these events, Public Utility District No. 1 of Snohomish County ("Snohomish") and EPMI entered into the Master Power Purchase Agreement, dated January 26, 2001, (the "Master Agreement"), which built upon a version of the Edison Electric Institute ("EEI") form agree-

ment[1] as well as a cover sheet containing additional terms. The Master Agreement set forth the terms pursuant to which the parties could subsequently enter into individual transactions for the purchase or sale of wholesale electric power at specified prices. Accordingly, the parties executed several written confirmations that documented certain transactions in which EPMI agreed to sell, and Snohomish agreed to buy, wholesale power at a set price for a fixed period of time. Section 10.6 of the Master Agreement provides that it will be governed by and construed in accordance with the laws of the State of New York.

Article Five of the Master Agreement is entitled Events of Default; Remedies. Section 5.1 enumerates the types of events that constitute default under the agreement. The section provides, in its relevant part, that

> An "Event of Default" shall mean, with respect to a Party (a "Defaulting Party"), the occurrence of any of the following:
>
> . . .
>
> (b) any representation or warranty made by such Party herein is false or misleading in any material respect when made or when deemed made or repeated;

1. The EEI form agreement is an industry standard contract for the purchase and sale of wholesale power.

2. Section 5.1 of the Master Agreement also provided that an Event of Default triggering the remedies available in Article Five could result from certain conduct on the part of Enron Corp., as guarantor of EPMI's performance under the Master Agreement. The section provides, in relevant part, that an Event of Default includes,

(h) with respect to [a Defaulting] Party's Guarantor, if any:

> (c) the failure to perform any material covenant or obligation set forth in this Agreement (except to the extent constituting a separate Event of Default, and except for such Party's obligations to deliver or receive the Product, the exclusive remedy for which is provided in Article Four) if such failure is not remedied within three (3) Business Days after written notice;
>
> (d) such Party becomes Bankrupt;
>
> (e) the failure of such Party to satisfy the creditworthiness/collateral requirements agreed to pursuant to Article Eight hereof.[2]

Master Agreement § 5.1.

Upon the occurrence of any of the enumerated default events, the non-defaulting party would have the right to terminate all outstanding transactions between the parties under the Master Agreement pursuant to certain specified procedures. Specifically, section 5.2 of the Master Agreement provides that

> If an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the "Non–Defaulting Party") shall have the right (i) to designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date

(i) if any representation or warranty made by a Guarantor in connection with this Agreement is false or misleading in any material respect when made or when deemed made or repeated;
(ii) the failure of a Guarantor to make any payment required or to perform any other material covenant or obligation in any guaranty made in connection with this Agreement and such failure shall not be remedied within three (3) Business Days after written notice;
(iii) a Guarantor becomes Bankrupt.
Master Agreement § 5.1(h).

("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a "Terminated Transaction") between the Parties, (ii) withhold any payments due to the Defaulting Party under this Agreement and (iii) suspend performance. The Non–Defaulting Party shall calculate, in a commercially reasonable manner, a Settlement Amount for each such Terminated Transaction as of the early Termination Date (or, to the extent that in the reasonable opinion of the Non–Defaulting Party certain of such Terminated Transactions are commercially impracticable to liquidate and terminate or may not be liquidated and terminated under applicable law on the Early Termination Date, then each such transaction (individually, an "Excluded Transaction" and collectively, the "Excluded Transactions") shall be terminated as soon thereafter as reasonably practicable, and upon termination shall be deemed to be a Terminated Transaction and the Termination Payment payable in connection with all such Transactions shall be calculated in accordance with Section 5.3 below). The Gains and Losses for each Terminated Transaction shall be determined by calculating the amount that would be incurred or realized to replace or to provide the economic equivalent of the remaining payments or deliveries in respect of that Terminated transaction. The Non–Defaulting Party (or its agent) may determine its Gains and Losses by reference to information either available to it internally or supplied by one or more third parties including, without limitation, quotations (either firm or indicative) of relevant rates, prices, yields, yield curves, volatilities, spreads or other relevant market date in the relevant markets. Third parties supplying such information may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendor and other sources of market information.

Master Agreement at § 5.2.

Thus, pursuant to the Master Agreement, the Non–Defaulting Party was responsible for liquidating and terminating all of the outstanding transactions, calculating the amount due for each transaction (the "Settlement Amount"), and netting Settlement Amounts with any other amounts due pursuant to the Master Agreement in order to arrive at the net amount due (the "Termination Payment"). Master Agreement at §§ 5.2–5.3. As the Termination Payment was linked to prices in the relevant wholesale-power market at the time of termination, either party could be "in the money" (i.e., the party owed money), even the Defaulting Party. Consequently, the Master Agreement contained what is known as a "full two-way payment" clause, which provided that "[t]he Termination Payment shall be due to or due from the Non–Defaulting Party as appropriate." Master Agreement at § 5.3. The Non–Defaulting Party was required to provide written notification to the Defaulting Party of the amount of the Termination Payment and whether it was entitled to receive or required to make the payment. Master Agreement at § 5.4. The Master Agreement further provided that the party that owed the Termination Payment was to pay it within two business days after the notice was effective. Master Agreement at § 5.4.

On November 28, 2001, Snohomish sent a letter (the "November 28 Letter") asserting that EPMI was in default of the Master Agreement and that, pursuant to Section 5.2 of the Master Agreement, Snohomish was exercising its right to terminate the Master Agreement. Snoho-

mish further indicated that it would suspend performance under the Master Agreement the following day and that it was unable at that time to determine the Settlement Amount.

Thereafter, Snohomish sent EPMI a letter, dated December 21, 2001 (the "December 21 Letter"), in which it asserted that, pursuant to section 5.4 of the Master Agreement, no Termination Payment was due from Snohomish to EPMI. Snohomish premised that assertion on its claim that the Master Agreement was null and void and of no effect because Snohomish had been fraudulently induced to enter into it as a result of false warranties, representations and covenants made by EPMI, as well as a misrepresentation as to the credit rating of Enron Corp. Alternatively, Snohomish asserted that, even if the Master Agreement had continued viability, nevertheless, Snohomish did not owe a Termination Payment because EPMI's financial condition foreclosed its ability to perform under the contract. As argued before the Court, Snohomish maintains that the basic reason for including the termination payment clause was that the continued performance of their respective obligations would result in Snohomish receiving the energy and EPMI receiving payments for the duration of the term of the particular transaction. Snohomish argues that because EPMI could not perform, the reason for the Termination Payment clause was not implicated in the transaction. In the December 21 Letter, Snohomish also contended that the price charged under the Master Agreement violated the Federal Powers Act (the "FPA") as an unjust and unreasonable rate and that the contract should be reformed.

On May 17, 2002, EPMI sent Snohomish a letter (the "May 17 Letter") informing it that the termination was ineffective and that Snohomish was obligated to continue to perform under the agreement by accepting power from EPMI. EPMI contended that neither rescission of the contract nor its reformation could be unilaterally declared. In the May 17 Letter, EPMI asserted that EPMI had the capacity to continue to perform under the contract and that, in any event, the only remedy pursuant to the Master Agreement was for a party to declare an early termination and calculate a Termination Payment. Therefore, EPMI maintained that, pursuant to the Master Agreement, Snohomish was obligated to calculate the Termination Payment amount and provide EPMI with notice of it. Prior to Snohomish's refusal to accept performance from EPMI, EPMI had performed its obligations under the Master Agreement. In addition, EPMI continues to maintain that a Termination Payment is intended as a measure of the gain or loss attained by a party from an early termination of the contract.

On June 19, 2002, Snohomish sent EPMI a letter reiterating its view that the Termination Payment was not due and stating that it had previously made that zero "calculation" in the December 21 Letter. Snohomish further contended that EPMI had not disputed that calculation pursuant to the procedural requirements of the Master Agreement.

By letter dated, July 30, 2002, EPMI notified Snohomish that "[b]ecause Snohomish has failed to provide EPMI with the Termination Payment notice and written statement explaining in detail the calculation of the Termination Payment as required by Section 5.4 of the [Master] Agreement, EPMI has been left with no alternative but to calculate and determine the amount of Termination Payment due from Snohomish." EPMI set forth its calculation of the Termination Payment and directed payment.

On January 31, 2003, EPMI filed a complaint commencing this adversary proceeding (the "Adversary Proceeding"). Included in the complaint was a claim for relief for the Termination Payment that Snohomish allegedly owed EPMI under the Master Agreement.

The Court entered an order, dated March 4, 2003, (the "Mediation Order") staying all activity in this and various similar "trading cases" and referring all such cases to mediation. On April 14, 2003, Snohomish filed a motion (the "Arbitration Motion") to dismiss the Adversary Proceeding, or in the alternative, to stay it pending arbitration. The Mediation Order effectively stayed the Arbitration Motion proceeding. The Mediation Order was subsequently modified, on May 18, 2005, to terminate the stay of litigation with respect to certain of the adversary proceedings, including the Snohomish Adversary Proceeding.

FERC had previously launched a comprehensive investigation of trading activities in the western electricity market and commenced enforcement proceedings against Enron and other market participants (the "Gaming and Partnership Proceeding"). On August 4, 2004, Snohomish filed a "Request for Clarification" concerning a FERC ruling in the Gaming and Partnership Proceeding. Through that request, Snohomish sought to have FERC resolve issues concerning EPMI's right to collect the Termination Payment. Snohomish sought discovery on those issues that ordinarily would not be permitted in arbitration, absent an affirmative grant of such authority. On October 26, 2004, EPMI filed a motion before the Court seeking to enforce the automatic stay and the Mediation Order and to compel Snohomish to withdraw its Request for Clarification. EPMI contended that, through the Request for Clarification, Snohomish was ac-

tually trying to infuse the state law contract issues pending before the Court into the Gaming and Partnership Proceeding. Snohomish countered that it was seeking a ruling from FERC in its regulatory capacity as to whether the Termination Payment violated the FPA, which Snohomish maintained was within FERC's police power exemption to the automatic stay. In the alternative, Snohomish sought to lift the stay, *nunc pro tunc*, to allow it to proceed with the Request for Clarification.

By order, dated January 14, 2005, the Court denied, as premature, Enron's motion to have Snohomish withdraw its Request for Clarification before FERC. The Court's ruling was premised upon the fact that it was unclear precisely what relief Snohomish was seeking from FERC by its Request for Clarification and, therefore, it could not be determined if such relief were necessary. The Court, however, denied Snohomish's motion to annul the automatic stay The Court further cautioned Snohomish that, to the extent FERC undertook to interpret the terms of or the parties' rights under the Master Agreement as it related to state law contractual issues, any such action would be void *ab initio*, as those matters were pending before the Court and the automatic stay had not been lifted to permit Snohomish to bring those issues before FERC. Snohomish filed an appeal to the January 14, 2005 order. No stay of the effectiveness of that order was entered.

In response to the imbalance resulting from Snohomish's attempt to litigate issues concerning the Termination Payment before FERC while litigation with respect to those issues was stayed before the Court, and because the parties' attention was diverted from the mediation process implemented by the Court, the Mediation Order was, as previously noted, modified to terminate the stay as to the Adversary Pro-

ceeding. Subsequently, a status conference was conducted before the Court on July 7, 2005, at which time EPMI requested permission to file a summary judgment motion concerning the Termination Payment in the Adversary Proceeding. Snohomish objected and argued that its Arbitration Motion should be heard before EPMI's summary judgment motion. On July 12, 2005, the Court granted EPMI's request to file a summary judgment motion and directed the parties to confer on a schedule as to that motion as well as the Arbitration Motion.

On August 5, 2005, Snohomish filed a new petition with FERC (the "FERC Petition") requesting that FERC determine whether the Termination Payment provisions were enforceable under the FPA. Thereafter, Congress enacted The Energy Policy Act of 2005. *See* Energy Policy Act of 2005, Pub.L. No. 109–58, § 1290, 119 Stat. 594, 983–84 (Aug. 8, 2005). Section 1290 ("Section 1290") of that act was of particular relevance to these proceedings. Snohomish argued that Section 1290 divested the Court of jurisdiction to determine the state law contractual issues bearing on the Termination Payment and granted FERC exclusive jurisdiction over those issues. EPMI argued that Section 1290 was clarifying legislation that maintained the status quo ante—both the Court and FERC possessing concurrent jurisdiction over the issue—that required Snohomish to obtain relief before the Court from the automatic stay prior to proceeding before FERC.

Upon EPMI's request, the District Court for the Southern District of New York (the "District Court") withdrew the reference in the Adversary Proceeding for the limited purpose of considering the effect of Section 1290. Specifically, EPMI sought a ruling that the Court—rather than FERC—had continuing jurisdiction to determine the state law Termination Payment issues. Further, EPMI requested that if the District Court were to construe Section 1290 as granting FERC exclusive jurisdiction over EPMI's state law contract claims regarding the Termination Payment, the District Court should also determine that such grant was unconstitutional.

In addition, following the passage of Section 1290, Snohomish amended the FERC Petition, on December 7, 2005, to include a request that FERC exercise the jurisdiction purportedly granted it under Section 1290 to determine if the Termination Payment provisions were enforceable under state law. Snohomish also requested that FERC enforce the Master Agreement and require EPMI to pay a termination payment to which Snohomish contended it was entitled. On February 6, 2006, Snohomish filed with FERC a motion for partial summary judgment concerning the Termination Payment issues.

Also subsequent to the passage of Section 1290, in a related proceeding concerning another energy trader, the Court concluded that, notwithstanding the pending District Court consideration of the effect of Section 1290, the Reorganized Debtors would not be prejudiced if the energy traders were allowed to proceed with their state law claims before FERC. The Court reasoned that if it were ultimately determined that FERC could not properly exercise exclusive jurisdiction over such matters pursuant to Section 1290, any proceeding that had been conducted based upon that premise would be void *ab initio*, which would nullify any resulting rulings by FERC.

On June 28, 2006, FERC issued an order (the "June 28 Order"), granting in part, and denying in part, the relief sought by Snohomish concerning the Termination Payment issues. *Public Util. Dist. No. 1*

*of Snohomish, Cty., Wash.,* Docket No. EL05–139–000, 2006 WL 1757334 (June 28, 2006). Specifically, FERC concluded that, based upon New York law, EPMI was not entitled to recovery of the Termination Payment. *Id.*

In the June 28 Order, FERC concluded that under New York law, the Master Agreement was properly rescinded and that EPMI could not enforce the Termination Payment provisions. *Snohomish, Cty., Wash.,* 2006 WL 1757334 at *1, 18–22. As FERC determined the issue under New York contract law, it concluded that it was unnecessary to reach the issue of whether the termination provisions of the Master Agreement were barred by the FPA. *Id.* FERC also denied Snohomish's request for a refund because FERC determined that Section 1290 only related to recoveries of termination payments by EPMI against Snohomish, not recoveries by Snohomish against EPMI. *Id.* at *2, 23.

Further, FERC acknowledged that it would not have ordinarily reached the Termination Payment issues, as they "require . . . the application of state law and do not otherwise require uniform interpretation with respect to the policies [FERC is] required to administer." *Snohomish, Cty., Wash.,* 2006 WL 1757334 at *1. Thus, FERC only addressed those issues because it viewed section 1290 as providing it with "exclusive jurisdiction . . . with respect to the termination payment claim." *Id.* Indeed, FERC declined to decide similar state law issues concerning other energy companies to which it did not determine Section 1290 applied.

On August 31, 2006, the District Court issued its opinion (the "District Court Opinion") concerning the effect of Section 1290. The District Court determined that the amendment was intended as clarifying legislation and that it did not transfer jurisdiction of the state law claims to FERC. *Enron Power Mktg., Inc. v. Luzenac America, Inc.,* Nos. 05 Civ. 9244, 10129, 2006 WL 2548453 (S.D.N.Y. Aug. 31, 2006). The District Court determined that the "jurisdiction over the state law contract issues lies with the bankruptcy court." *Id.* at *17.[3] Snohomish appealed the District Court's ruling to the Second Circuit Court of Appeals.

As the District Court concluded that Section 1290 was a clarifying amendment that did not alter FERC's jurisdiction, the portion of the FERC Petition proceeding involving the interpretation of state law contractual issues was not within FERC's police power exception to the automatic stay. Rather, the District Court concluded that the Court had continuing jurisdiction over the state law contractual issues concerning the Termination Payment provisions of the Master Agreement. *Luzenac,* 2006 WL 2548453 at *17. Based upon the District Court's ruling, the Court observed that FERC could only have exercised its concurrent jurisdiction to adjudicate the state law contractual claims if Snohomish had first obtained relief from the automatic stay. As the automatic stay had not been lifted, the FERC Petition proceeding, insofar as it related to the state law Termination Payment issues, was

**3.** As a result of its interpretation of Section 1290, the District Court did not address the "several grave constitutional questions that could arise by interpreting [Section 1290] in the way that [Snohomish] . . . suggest[s], that is, as granting FERC exclusive jurisdiction over the state law claims for termination payments. Among the many potential constitutional concerns if [Section 1290] were to grant FERC exclusive jurisdiction over the state law claims are, for example, violations of the Bankruptcy Clause and the principle of separation of powers." *Luzenac,* 2006 WL 2548453 at *12.

void *ab initio* and the resulting June 28 Order[4] was a nullity.

On October 6, 2006, EPMI filed a motion for partial summary judgment (the "EPMI Summary Judgment Motion"), currently before the Court, concerning EPMI's entitlement to the Termination Payment pursuant to the Master Agreement. Although the Court had approved EPMI's request to file such a motion on July 12, 2005, its filing had been forestalled by the intervening events.

By letter, dated October 6, 2006, Snohomish requested that the Court stay consideration of the EPMI Summary Judgment Motion pending the resolution of the appeal of the District Court Opinion to the Second Circuit. EPMI opposed Snohomish's request, arguing that if the Court were to await the Second Circuit's ruling, it would only further delay the outcome of the Adversary Proceeding, which had then been pending for almost four years. By order, dated October 11, 2006, the Court denied Snohomish's motion to stay the Adversary Proceeding.

Snohomish appealed the October 11, 2006 order denying its request to stay the Adversary Proceeding and sought to withdraw the reference of the Adversary Proceeding to the Court. On December 13, 2006, the District Court denied the request to withdraw the reference, holding that the elements for such withdrawal had not been established. In addition, in its December 13, 2006 ruling, the District Court noted that while the District Court Opinion did not include a mandate that the bankruptcy court proceed with the litigation pending the appeal to the Second Circuit, it was nevertheless within the bankruptcy court's discretion as to whether it would proceed with it.

Notwithstanding the District Court Opinion, on October 6, 2006, Snohomish filed a new petition (the "October Petition") with FERC seeking, *inter alia*, entry of an order declaring that EPMI violated the June 28 Order by attempting to enforce the Termination Payment provisions through the EPMI Summary Judgment Motion and that continuation of such action was sanctionable. Snohomish filed the October Petition without seeking relief from the automatic stay.

In October 2006, EPMI filed a motion (the "Enforcement Motion") before the Court seeking an order enforcing the automatic stay and enjoining Snohomish from further prosecution of the October Petition. Snohomish opposed the relief and argued that the FERC Petition and the October Petition proceedings were regulatory in nature and unimpeded by the automatic stay. The Court concluded that, based upon the District Court Opinion, to the extent state law Termination Payment issues were addressed in the FERC Petition proceeding, it violated the automatic stay. As previously noted, the Court does not dispute FERC's exclusive jurisdiction to determine regulatory issues. Nor does it dispute that, had the stay been lifted, FERC could have exercised its concurrent

---

4. In the June 28 Order, FERC recognized that the issue of the interpretation of Section 1290, including its constitutionality was pending before the District Court for the Southern District of New York. *Public Util. Dist. No. 1 of Snohomish, Cty., Was.*, Docket No. El05–139–000, 2006 WL 1757334 at *3 (June 28, 2006). Thus, Snohomish was cognizant of the fact that the District Court's ruling could impact FERC's June 28 Order. Specifically, implicit within the scope of the District Court's interpretation of Section 1290 and its constitutionality would be a resolution of whether FERC had exclusive jurisdiction of the state law contract issue involving the Termination Payment. Moreover, Snohomish and the United States, as intervenor, were parties to the proceeding before the District Court and are bound by its ruling.

jurisdiction to adjudicate the state law contractual claims. Snohomish, however, had not obtained relief from the automatic stay to have those issues considered by FERC.

As the Court discussed in its ruling concerning the Enforcement Motion, in both the FERC Petition and October Petition proceedings, Snohomish sought to adjudicate before FERC non-FPA related issues. The October Petition sought to enforce the June 28 Order resulting from a proceeding in which, as expressly stated by FERC and as observed by the District Court, FERC adjudicated state law contractual issues. As Snohomish sought FERC's determination on the state law issues without first obtaining relief from the stay, the FERC Petition proceeding was void *ab initio*. Further, Snohomish sought, in the October Petition, to preclude EPMI from continuing to litigate before the Court the Termination Payment issues that the District Court has expressly returned to the Court for determination. The Court concluded that any attempt to enforce the June 28 Order issued by FERC violated the automatic stay insofar as it concerned state law contractual issues, i.e., issues concerning the Termination Payment under the Master Agreement which the District Court returned to the Court for resolution. The Court further concluded that because the FERC Petition proceeding was void *ab initio* regarding the state law claims, any order emanating from such proceeding was equally without force. Inasmuch as there was no order for FERC to enforce, there was no violation of FERC's power to enforce orders. As a result, the Court granted EPMI the relief it sought in the Enforcement Motion.

To that effect, the Court entered an Order, dated October 30, 2006 (the "October 30 Order") which, among other things, enforced the automatic stay and directed Snohomish to withdraw the October Petition insofar as it sought entry of an order declaring that EPMI was violating the June 28 Order by attempting to enforce the Termination Payment provisions before the Court. Snohomish asserts that it has since complied with that directive.[5] In addition, Snohomish has filed an appeal of the October 30, 2006 Order.

On November 14, 2006, Snohomish filed a pleading renewing the Arbitration Motion, opposing the EPMI Summary Judgment Motion, and also seeking summary judgment (the "Snohomish Summary Judgment Motion") on certain of its defenses to enforcement of the Termination Payment provision.

*Parties Contentions*

In the EPMI Summary Judgment Motion, EPMI argues that pursuant to the terms of the Master Agreement, it is entitled to the Termination Payment. Snohomish opposes the EPMI Summary Judgment Motion and is also pursuing the Arbitration Motion. Snohomish contends that, to the extent this matter is not decided by FERC, the Master Agreement requires that it be sent to arbitration. EPMI opposes the Arbitration Motion and argues that by its actions Snohomish has waived its right to exercise the arbitration clause or, alternatively, that the Court should not lift the automatic stay to permit arbitration but should retain jurisdiction to determine the state law contractual issues.

Snohomish further argues that, regardless of whether this matter is sent to arbi-

---

**5.** *See* Notice of Withdrawal and Amended Petition of Public Utility District No. 1 of Snohomish County, Washington for Declaratory and Interim Relief, and for Expedited Consideration, *Pub. Util. Dist. No. 1 of Snohomish County, Wash et al.,* EL9–05–139 *et al.* (F.E.R.C. Nov. 1, 2006)

tration, EPMI cannot collect the Termination Payment based upon certain rulings by FERC; that EPMI has not established its entitlement to summary judgment; and that the Master Agreement is unenforceable based upon certain defenses, including that it was fraudulently induced. EPMI counters that its recovery of the Termination Payment is not precluded by FERC's previous rulings, that it has established its entitlement to summary judgment and that Snohomish's defenses fail as a matter of law. Snohomish counters that it is entitled to summary judgment on its defense of fraudulent inducement.

As noted, Snohomish argues that to the extent issues are presented that are not within FERC's exclusive jurisdiction, those issues should be decided by an arbitrator. Prior to addressing the issue of arbitration, the context in which Snohomish raises its arguments requires the Court to address certain other issues preliminarily. Specifically, Snohomish alternatively argues that, based upon prior rulings by FERC, there is an absence of authority to enforce the Termination Payment provision or, at a minimum, any ruling concerning the collection of the Termination Payment should be deferred until FERC resolves the regulatory issues pending before it. Although Snohomish raises these as alternate arguments to the applicability of the arbitration clause, nevertheless, this challenge bears on this Court's determination to proceed at all and interpret any aspect of the Master Agreement. Thus, it is only if the Court has determined that it will not defer the matter pending a ruling by FERC that it is required to reach the issue of arbitration. Therefore, the Court must set forth its rationale for not awaiting a FERC determination in the regulatory proceedings prior to issuing this decision.

Snohomish's argument, that enforcement of the Termination Payment should be deferred until FERC resolves the regulatory issues, is based upon various theories. In particular, Snohomish argues that there is not a valid filed rate to enforce as a result of prior actions by FERC and the absence of a FERC review of the market. In addition, Snohomish argues that the doctrine of primary jurisdiction requires that the Court defer ruling until FERC renders its ruling, or that it is premature for the Court to rule prior to the conclusion of the FERC proceeding.

*Revocation Order*

Snohomish argues that because EPMI's market-based rate authority was revoked in 2003, it cannot collect the Termination Payment, pursuant to 18 C.F.R. § 35.1(e), which provides that

No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of the Commission, or impose any classification, practice, rule regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.

18 C.F.R. § 35.1(e). Snohomish maintains that under FERC's market-based rate program, EPMI must have a market-based rate authorization and valid tariff on file before it can enforce any market-based contract like the Master Agreement. Snohomish states that FERC deprived EPMI of market-based rate authority in 2003 and declined to provide it with "wind-down authority" although other Enron entities were provided with such authority. *Enron Power Marketing, Inc.*, 103 FERC ¶ 61,343, 2003 WL 21480248 *21, 23 (June

25, 2003), *reh'g denied,* 106 FERC ¶ 61,024 (2004) (the "Revocation Order"). Snohomish argues that, as a result of the Revocation Order, EPMI currently does not have a tariff on file with FERC and, therefore, is legally precluded, pursuant to section 35.1(e) of the Commission Regulations, from seeking to "demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service" under the Master Agreement. Snohomish argues that to collect on the Termination payment claim, EPMI must reapply to FERC for new authorizations or, at a minimum, wind-down authority. Snohomish also urges that FERC has already determined the rates that EPMI seeks to collect to be unjust and unreasonable.

Alternatively, Snohomish argues that the EPMI Summary Judgment Motion is premature and cannot be properly determined until FERC completes its regulatory function. Snohomish asserts that in various proceedings within its exclusive jurisdiction, including the Gaming and Partnership Proceeding and the FERC Petition proceeding, FERC is considering a range of regulatory issues related to the Termination Payment, including whether the Termination Payment is precluded by the FPA, as well as related questions concerning whether the rates are just and reasonable. Snohomish also asserts that FERC is considering available remedies for market manipulation, including disgorgement of unjust profits, revocation of Enron's market-based rate authority retroactively, and additional non-monetary relief. Snohomish argues that while the FERC proceedings are ongoing, the Court should defer to FERC on issues within its exclusive authority and that it is premature to allow EPMI to collect before FERC determines those issues. Snohomish asserts that just and reasonable rates can only emanate from a properly functioning market. Snohomish maintains that the rates at issue here evolved from a manipulated market and, as a result, they are neither just nor reasonable and cannot be enforced until FERC completes the ongoing proceedings and formulates an appropriate remedy for the dysfunctional market. Snohomish urges that a review is an essential prerequisite for determining whether the rates are just and reasonable and that, absent such review, the tariff is not in compliance with the filed-rate doctrine or the FPA.

EPMI counters by arguing that the Revocation Order is prospective not retroactive. EPMI contends that it is entitled to enforce and collect amounts due under a non-revoked contract which was executed and terminated one and one-half years prior to the Revocation Order. Enron asserts that this is evidenced by FERC upholding the viability of other contracts entered into pursuant to EPMI's market-based rate authority prior to the Revocation Order. EPMI cites to *El Paso Elec. Co.,* Docket Nos. EL02–113–000, EL03–180–000, EL03–154–000, 2004 WL 1633470 at *7 n. 10 (F.E.R.C.2004) (citing *Prior Notice & Filing Requirements Under Part II of the Federal Power Act,* 64 Docket No. PL93–2–002, 1993 WL 285371, *order on reh'g,* 1993 WL 414816 (F.E.R.C. 1993)) where FERC stated that

> A revocation of market based rates or a disgorgement of profits would not void contracts that parties may have signed, the rates may be changed prospectively or disgorgement of profits may be ordered, but the contract remains.

EPMI finds further support in the fact that, after FERC issued the Revocation Order and was fully aware of the market manipulation findings on which revocation was based, FERC, nevertheless, upheld the validity of EPMI's long-term power contracts with two other counter-parties,

Nevada Power Company ("Nevada Power") and Sierra Pacific Power Company ("Sierra Power").

EPMI further argues that FERC has neither determined that the rates are unjust and unreasonable nor has it issued a ruling that Enron manipulated the long-term power market. In addition, EPMI contends that the FERC ruling concerning market manipulation Snohomish references related to the California market and not the Pacific Northwest market in which Snohomish operates. Further, EPMI asserts that FERC concluded that the Pacific Northwest power market was not manipulated.

■ On June 25, 2003, FERC issued an order that revoked EPMI's authorization to sell power at market-based rates and terminated its electric market-based rate tariff. *Enron Power Marketing, Inc.*, 103 FERC ¶ 61,343, 2003 WL 21480248 *21, 23 (June 25, 2003) (the "Revocation Order"). FERC determined that it would not provide EPMI with wind-down authority based upon its conclusion that "[u]nlike the other entities that have a specified need for continued authorization," EPMI had not made a request or showing that it needed "to retain its market-based rate authority for unwinding or otherwise." *Id.* at *21. It further determined that if EPMI emerges from reorganization, it must re-apply to FERC for new authorizations. *Id.*

The Court agrees with EPMI that the Revocation Order is prospective. While it precludes EPMI from entering into new market-based contracts, it does not preclude enforcement of previously executed agreements. This interpretation has been endorsed by FERC, which after issuing the Revocation Order, upheld the enforcement of similar contracts that EPMI had with other counter-parties and affirmed

the denial of a request to modify such contracts. *Nevada Power Co., et al. v. Enron Power Marketing, Inc., et al.* ("FERC Nevada Decision"), 103 FERC ¶ 61,353, 2003 WL 21485862 *1, 25 (June 26, 2003). Indeed, that decision required the continued payment of the contract rates. *Id.* at *3.

The Court discussed the interplay between the Revocation Order and the FERC Nevada Decision in *Enron Power Marketing, Inc. v. Nevada Power Co. (In re Enron Power Marketing, Inc.)* ("Nevada I"), Docket Adv. Pro. No. 02–2520, slip op. (Bankr.S.D.N.Y. August 28, 2003), an adversary proceeding in which the Court granted EPMI's motion against Nevada Power and Sierra Power to enforce the relevant contractual termination payment provisions. As the Court noted, the FERC Nevada Decision affirmed a ruling denying a request to modify certain power contracts. *Id.* at *7. The Court further noted that "[t]he Revocation Order ... is prospective. It bars EPMI from entering into new market-based contracts, but does not impair EPMI's ability to enforce previously executed agreements. This is apparent from FERC's decision ... [where it] determined to uphold enforcement of the parties' contracts despite [FERC's] issuance the previous day of the Revocation Order." *Id.* at *9. Moreover, in reaching its conclusion, FERC considered the evidence concerning claims of market manipulation and reviewed a staff report issued in a separate proceeding that had considered manipulation in the spot-market and its effect on the long-term market. *Id.* at *7 (citing FERC Nevada Decision, 2003 WL 21485862, at *22).

■ As referenced above in the language EPMI quoted from FERC, the revocation of market based rates does not

void the contract.[6] Rather, the contract continues with the same rates and the parties must await a determination by FERC as to whether it will adjust rates or order a disgorgement of profits. In that regard, FERC has not made a determination that the rates at issue are unjust and unreasonable. On the contrary, in the June 28 Order FERC denied Snohomish's request for a refund of charges made under the Master Agreement, holding that the issue was still under consideration in the Gaming and Partnership Proceeding. If the issue had already been determined, FERC clearly would not continue to consider it.

■ Finally, with respect to Snohomish's argument that 18 C.F.R. § 35.1(e) precludes EPMI from collecting the Termination Payment, such an interpretation directly contravenes the filed-rate doctrine. The filed-rate doctrine requires that the relevant contract rate be applied until set aside by FERC. Although FERC has revoked, prospectively, EPMI's rate-based authority and did not provide EPMI with wind-down authority—because EPMI saw no need for it to close out these contracts as, presumably, recognized by FERC—FERC has not set aside the applicable rates. Unless and until FERC adjusts the relevant rates, those rates must be applied, including with regard to any calculation of payments under the Master Agreement. As previously noted, FERC itself has recognized that contracts are enforceable even after the revocation of market-based authority. The Court cannot read an agency regulation in a way that would undermine the filed-rate doctrine, especially where the agency that promulgated that regulation has not applied it in that manner.

*Primary Jurisdiction*

■ In a related argument, Snohomish contends that the primary jurisdiction doctrine requires that the Court await FERC's determination on the remedial issues.[7] In opposition to this contention, EPMI argues that the primary jurisdiction doctrine does not apply to the state law contractual Termination Payment issues.

■ Primary jurisdiction applies where a claim is originally cognizable in the courts, but where its enforcement requires resolution of issues that have been placed within the special competence of an administrative body under a regulatory scheme. *Fulton Cogeneration Associates v. Niagara Mohawk Power*, 84 F.3d 91, 97

6. Snohomish argues that EPMI's reference to the language in the FERC decision—to the effect that the revocation of market-based rates or the disgorgement of profits does not void a contract but it remains viable—was "singled out" by the Ninth Circuit in *Public Utility District No. 1 of Snohomish County v. FERC*, 471 F.3d 1053, 1084 (9th Cir.2006), to exemplify "how FERC acted arbitrarily and capriciously in refusing to fully remedy the effects of the Western power crisis." Snohomish further maintains that the Ninth Circuit concluded that FERC's refusal to reform the contract at issue there, despite what FERC identified as Enron's violation of its market-based rate authority, was an abdication of FERC's statutory responsibility to *set just and reasonable rates.*

However, even accepting Snohomish's characterization of the Ninth Circuit's ruling, such characterization merely reinforces the fact that FERC is charged with the responsibility for adjusting rates and that FERC has yet to adjust those rates. The rates, therefore, must be enforced until they are set aside by FERC.

7. Though Snohomish, in part, couches its argument for deferral in terms of primary jurisdiction, and although the Court will discuss primary jurisdiction in that regard, the Court notes that primary jurisdiction more properly concerns referral of an issue to a regulatory agency, not deferral of a ruling pending resolution of proceedings before the agency.

(2d Cir.1996) (citing, *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). The doctrine of primary jurisdiction allows a federal court to refer a matter outside its conventional experience to an administrative agency with expertise on the issue. *Nat'l Communications Ass'n, Inc. v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995). Thus, the doctrine of primary jurisdiction is relevant where a court and an administrative agency have concurrent jurisdiction and it remains within the court's discretion to determine whether it will refrain from exercising its jurisdiction and refer the matter to an administrative agency premised upon primary jurisdiction. *Enron Power Marketing, Inc. v. Nevada Power Co., (In re Enron Corp.)* ("*Nevada II*"), Adv. Pro. No. 02–2520, Order, Docket entry # 318 at *3 (January 4, 2005).

 Primary jurisdiction does not apply to legal questions within a court's conventional competence. *New York State Elec. & Gas Corp. v. New York Independent System Operator, Inc.*, 168 F.Supp.2d 23, 26 (N.D.N.Y.2001). Rather, a court will defer to an agency under the doctrine of primary jurisdiction when a case involves "technical and intricate questions of fact and policy that Congress assigned to a specific agency." *National Communications Ass'n, Inc. v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995). In such instances, the agency is "better equipped" to consider the issues because through experience, the agency has developed specialized expertise, knowledge, and insight into the issues involved and has more flexible procedures. *Tassy v. Brunswick Hosp. Center, Inc.*, 296 F.3d 65, 68 (2d Cir.2002); *In re Magnesium Corp. of America*, 278 B.R. 698, 706 (Bankr.S.D.N.Y.2002).

 In determining whether an agency has primary jurisdiction, a court considers the following four factors

1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise,

2) whether the question at issue is particularly within the agency's discretion,

3) whether there exists a substantial danger of inconsistent rulings, and

4) whether a prior application to the agency has been made.

*New York State Elec. & Gas Corp.*, 168 F.Supp.2d at 26. In addition, a court must balance the advantages of applying primary jurisdiction with the possible costs that may result from complications and delay in the administrative proceeding. *National Communications Ass'n, Inc. v. AT & T Co.*, 46 F.3d at 223.

 The purposes to be served in applying the primary jurisdiction doctrine are (1) to promote uniformity and consistency, for example, in rates and tariffs, and (2) to allow for reliance on the administrative expertise of an agency that has been charged with the task of overseeing the particular industry. *Tassy*, 296 F.3d at 68. Thus, a court must consider whether the conditions for application of primary jurisdiction are present and whether application of the doctrine will aid in promoting these purposes. *Id.*

Contract interpretation is a matter within the competence of courts. Moreover, contract enforcement is not within FERC's specific expertise. Indeed, FERC itself has rejected the premise of Snohomish's argument in similar trading cases where the energy trader involved was not adjudged to be subject to the dictates of Section 1290. *See, e.g., City of Vernon*, Docket No. EL06–3–000, 2006 WL 1757331 (FERC June 28, 2006). Thus, when FERC is presented with state law contract issues and is not purportedly granted ju-

risdiction by Section 1290, FERC declines to address standard contract issues. *See e.g., City of Vernon,* 2006 WL 1757331 at *11. FERC does not consider that it has special expertise on state law issues, nor do such issues implicate the FPA. *Id.* Here, the contract issues raised in connection with Termination Payment are within the competence of a court and do not require FERC's expertise to resolve.[8] Moreover, if the Court were to conclude that the arbitration clause were waived or otherwise unenforceable, the Court would immediately proceed to resolve the summary judgment motions concerning enforcement of the Termination Payment clause.

 Snohomish also argues that the Court should defer ruling because it is premature to rule before FERC concludes its remedial proceedings. The purpose of the filed-rate doctrine, however, does not favor deferral here. While it is within the Court's discretion to defer ruling in order to promote an efficient resolution of claims, that interest does not override the policy embodied in the filed-rate doctrine. As previously noted, FERC recognized the continued viability of the filed rate in similar contracts that EPMI entered with Nevada Power and Sierra Power when it determined that EPMI could continue to charge the contracted rate for power. The contract rate must be enforced until set aside by FERC and any allegations properly before the regulatory agency[9] must await that agency's determination on whether it will adjust the rates. *Nevada I,* at *11. Moreover, it would be contrary

to the proper functioning of a regulated market and the goal of uniformity to allow one party to escape its obligation to pay under a tariff considered just and reasonable by the regulatory agency just because of the identity of the counter-party. *Id.*

The filed rate must be collected despite its sometimes harsh consequences because it incorporates the policy which Congress has adopted in regulating interstate commerce. *Louisville & Nashville RR Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49–50, 67 L.Ed. 183 (1922). The strictness of the rule is tempered by the fact that other avenues for relief are available to the aggrieved ratepayer, thus, when fraud is alleged, the regulatory agency can investigate the charges and issue appropriate remedies to benefit ratepayers. *Wegoland,* 27 F.3d at 21. In addition, the fact that the rates are filed is not a bar to governmental proceedings into the alleged fraudulent conduct. *Square D Co.,* 476 U.S. at 416 n. 17, 106 S.Ct. at 1926 n. 17; *Keogh,* 260 U.S. at 162, 43 S.Ct. at 49. Indeed, the Gaming and Partnership Proceeding and the FERC Petition proceeding are examples of the other avenues for relief available to the aggrieved ratepayer.

Thus, the issues being investigated by FERC are not considered when determining whether the Termination Payment is enforceable under state-contract law. The filed-rate doctrine requires adherence to the rates set forth in the Master Agreement and its enforcement applying those

---

8. Moreover, the state law contractual issues related to the Termination Payment were before the Court first. The sole reason FERC entertained the state law contractual issues presented in the FERC Petition and issued the June 28 Order was in response to the enactment of Section 1290. As previously discussed, the June 28 Order was a nullity.

9. In a regulated *industry,* the filed-rate doctrine requires that the regulatory agency—not a court—determine whether a party's conduct that impacts filed rates should be sanctioned or redressed. *Nevada I,* at *11.

rates unless and until set aside by FERC. Any other interpretation would run counter to the filed-rate doctrine because purchasers of energy who lodged complaints with FERC could unilaterally determine to stop paying the filed rate prior to any determination by FERC setting aside those filed rates. The Court's interpretation of the arbitration clause and the resulting resolution of the state law contract issues by either the Court or the arbitrator will not impact or otherwise undermine FERC's procedures or its determination concerning whether the filed tariff is unjust or unreasonable.

Accordingly, as the pending FERC proceedings do not concern the same issues that must be resolved in interpreting the Master Agreement, the doctrine of primary jurisdiction is not implicated with respect to the FERC proceedings. Therefore, in accordance with the Court's previous decisions concerning Nevada Power and FERC's recent decisions, the Court rejects Snohomish's primary jurisdiction argument. Nor would proceeding with the parties' respective summary judgment motions be premature, as the filed-rate doctrine requires enforcement of the filed rate until set aside. Moreover, there is no impediment to proceeding with an interpretation of the Master Agreement await-

ing a determination by FERC in the Gaming and Partnership Proceeding or the FERC Petition proceeding concerning whether the rates are just and reasonable or whether a refund or disgorgement of profits is required. The resolution of the issues involved in the adversary proceeding will not interfere with FERC's continuation of any of the proceedings before it concerning its police and regulatory function. Further, any determinations by FERC in those proceedings that impact on any resolution of the state law issues— such as would be the case if rates charged were adjusted by FERC—will be appropriately incorporated if and when they become applicable. Alternatively, if FERC were to determine that amounts collected should be refunded or disgorged, at that time such a ruling could be implemented in accordance with applicable law. Having determined that consideration of the adversary proceeding should not be deferred awaiting FERC's resolution of the regulatory issues, the Court will proceed to address the arbitration issues.

### Arbitration

Snohomish argues that this matter should be sent to arbitration pursuant to the terms of the Master Agreement.[10] Snohomish contends that while FERC's

---

**10.** The arbitration clause contained in section 10.12 of the Master Agreement provides, in relevant part, that

Any claim, counterclaim, demand, cause of action, dispute, and controversy arising out of or relating to this Agreement or the relationship established by this Agreement, any provision hereof, the alleged breach thereof, or in any way relating to the subject matter of this Agreement, involving the Parties and/or their respective representatives (for purposes of this Section 10.12 only, collectively the "Claims"), even though some or all of such claims allegedly are extra-contractual in nature, whether such Claims sound in contract, tort, or otherwise, at law or in equity, under state or

federal law, whether provided by statute or the common law, for damages or any other relief, shall be resolved by binding arbitration. Arbitration shall be conducted in accordance with the rules of arbitration of the Federal Arbitration Act and, to the extent an issue is not addressed by the federal law on arbitration, by the commercial Arbitration Rules of the American Arbitration Association. The validity, construction, and interpretation of this agreement to arbitrate and all procedural aspects of the arbitration conducted pursuant hereto shall be decided by the arbitrators. In deciding the substance of the Parties' Claims, the arbitrators shall refer to the governing law.

exclusive jurisdiction over certain claims takes precedence over the arbitration clause contained in the Master Agreement, to the extent that any claim is litigated outside FERC, it must be decided in arbitration as provided for in the Master Agreement.

EPMI argues that Snohomish waived its right to seek enforcement of the arbitration clause when it elected to litigate EPMI's entitlement to the Termination Payment before FERC and seek discovery on that issue. In addition, EPMI contends that the automatic stay, which remains in effect through the Plan and Confirmation Order, precludes enforcement of the arbitration clause and should not be lifted under the circumstances of this case.

Federal policy favors arbitration as an alternate means of dispute resolution. *PPG Industr. Inc. v. Webster Auto Parts, Inc.,* 128 F.3d 103, 107 (2d Cir. 1997). As a result of the strong presumption in favor of arbitration, its waiver is not readily inferred. *Cotton v. Slone,* 4 F.3d 176, 179 (2d Cir.1993). Indeed, any uncertainty concerning its waiver is resolved in favor of proceeding with arbitration. *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.),* 226 F.3d 160, 163 (2d Cir.2000). Nevertheless, arbitration can be waived where "a party engages in protracted litigation that results in prejudice to the opposing party." *Cotton,* 4 F.3d at 179. In addition, a party can waive arbitration when it takes action inconsistent with the right to arbitration where prejudice results. *Lubrizol Int'l, S.A. v. M/V Stolt Argobay,* 562 F.Supp. 565, 573 (S.D.N.Y.1982). However, where there is no extensive litigation and no proof of prejudice, the right to arbitrate is not waived. *Louis Dreyfus Negoce S.A. v. Blystad Shipping and Trading, Inc.,* 252 F.3d 218, 229 (2d Cir.2001).

The type of prejudice required for waiver stems from the inherent unfairness resulting from "delay, expense or damage to a party's legal position." *PPG Industr.,* 128 F.3d at 107. This unfairness is present when a party is forced to litigate an issue and later required to arbitrate the same issue. *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 134 (2d Cir.1997). There must be "substantive" prejudice to a party's claims if they were forced to arbitrate. *Id.* Moreover, it is the presence or absence of prejudice that is determinative of the issue of waiver. *Lubrizol Int'l,* 562 F.Supp. at 573.

Courts have found sufficient prejudice for waiver where a party seeking arbitration

-engages in discovery procedures not available in arbitration,

-makes motions going to the merits of an adversary's claims, or

-delays invoking arbitration rights while the adversary incurs unnecessary delay or expense.

*Cotton,* 4 F.3d at 179. (citations omitted). However, incurring legal expenses associated with litigating a matter, by itself, may not be considered sufficient prejudice. *PPG Industr.,* 128 F.3d at 107. Nor is there prejudice where others are parties to the dispute but are not subject to arbitration even if a party subject to arbitration has to litigate in more than one forum. *Blystad Shipping and Trading,* 252 F.3d at 230. Moreover, there are no bright-line rules as the decision is very fact specific. *Cotton,* 4 F.3d at 179. Indeed, a decision on waiver must be based on the circumstances and context of the particular case. *Doctor's Assocs.,* 107 F.3d at 130.

Factors considered by a court in determining whether to send a matter to arbitration include

-the time elapsed from the commencement of litigation to the request for arbitration,

-the amount of litigation, including any substantive motions and discovery, and

-proof of prejudice.

*PPG Industr.*, 128 F.3d at 107.

■ A party waives the right to invoke arbitration where it has previously litigated the same legal and factual issues even if that litigation occurred as part of a separate action or in a different forum. *PPG Industr.*, 128 F.3d at 108 n. 2. The waiver, however, only occurs where "a party has previously litigated the same claims it now seeks to arbitrate." *Doctor's Assocs.*, 107 F.3d at 133. Thus, there is no waiver if the two suits involve different issues. *Id.* Nor can waiver of the right to arbitrate certain claims be inferred based upon the explicit waiver of other claims. *Id.* In addition, the "litigation of non-arbitrable claims does not waive a party's right to arbitrate other arbitrable claims." *Doctor's Assocs.*, 107 F.3d at 132 n. 11. Thus, it is the "prior litigation of the same legal and factual issues" as the party subsequently seeks to arbitrate that results in the waiver of the right to arbitrate. *Id.* at 133.

■ As a preliminary matter, Snohomish argues that the arbitration clause is part of the filed rate and that, as a result, FERC is the proper forum in which to address any modification to the arbitration clause or any equitable defense to its enforcement. Snohomish references the Court's decision in *Nevada I* in support of its position that ancillary conditions and terms are included within the ambit of the filed rate and are part of the tariff, and that equitable defenses to such rates are not recognized because only FERC can alter the tariff. Thus, Snohomish argues, because the arbitration clause is a term of the contract, it is part of the filed rate, and

FERC must address any request to modify or waive it.

■ The filed-rate doctrine requires that any filed rate "approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994). This doctrine recognizes that legislative bodies establish agencies for the purpose of setting rates, and courts are not suited to "engage in retroactive rate setting." *Id.* at 19. The agency approval establishes the reasonable rate which cannot be varied by either contract or tort unless and until the rate is suspended or set aside. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 416–17, 106 S.Ct. 1922, 1927, 90 L.Ed.2d 413 (1986). Sellers regulated by FERC must charge only the rate filed with FERC and only FERC may alter that rate. *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1471 (5th Cir.1987). The court may not determine the reasonableness of the rate nor replace it with one it considers more reasonable. *Id.* at 1470.

■ In the *Nevada I* decision, the Court referenced the fact that recognizing certain defenses to enforcement of a contract would be directly contrary to the filed-rate doctrine, as "[t]he thrust of all of these types of allegations is that absent the improper conduct, different rates would have applied." *Nevada I*, at *4 (citing, *District No. 1 of Snohomish County v. Dynegy Power Marketing, Inc., et al. (In re California Wholesale Elec. Antitrust Litigation)*, 244 F.Supp.2d 1072, 1077 (S.D.Cal.2003)). Therefore, the filed rate doctrine dictates that equitable defenses cannot prevent the collection of a published tariff. *Humboldt Express, Inc. v. The Wise Co., Inc. (In re Apex Express Corp.)*, 190 F.3d 624, 639 n. 21 (4th Cir.1999). If

presented with a defense or allegation that required the calculation of damages, the court could potentially conclude that a rate different from that filed was proper. *California Wholesale,* 244 F.Supp.2d at 1077. Thus, addressing any such claim would contravene the filed-rate doctrine, which precludes a court from determining the reasonableness of the filed rate. *Id.*

In the instant matter, EPMI is not seeking to modify or eliminate the arbitration clause. Rather, it is arguing that Snohomish waived its right to exercise that clause, a determination that does not impact the rates that would apply and, therefore, does not implicate the filed-rate doctrine. Thus, while interpreting the Master Agreement under state law, the Court can determine whether Snohomish has waived its right to arbitration. This contractual issue does not require FERC's expertise, and as the Court would not be making any determination that impacts the validity of the rates, it is within the competence of the Court to determine whether the right to arbitration has been waived.

A broad claim or defense that attacked the arbitration clause *per se,* such as whether arbitration were an appropriate procedure for resolving energy trading disputes or whether it violated a federal statute that FERC administered, would be an issue for FERC. *See Metro East Center,* 294 F.3d at 927–28 (noting that "any broader claim such as arbitration is an inappropriate practice in the telecommunications business or transgresses some aspect of the federal statutes that the FCC administers, is an argument for the FCC alone"). Thus, an effort to suspend or annul any section of a filed tariff would be an issue for the regulatory agency. *Id.*

EPMI, however, is not arguing that the arbitration clause is not an appropriate procedure for resolving energy trading disputes. Rather, EPMI is asking for a determination that Snohomish has waived the right to exercise that clause. EPMI acknowledges that the arbitration clause would be enforceable absent waiver by the counter-party or a conflict with the objectives of the Bankruptcy Code.[11]

Moreover, the Master Agreement incorporates the FAA and, therefore, the filed tariff authorizes the court to determine whether a dispute is arbitrable under 9 U.S.C. § 3.[12] *Metro East Center for Conditioning and Health v. Qwest Communications Int'l, Inc.,* 294 F.3d 924, 927 (7th Cir.2002). This role is in accord with the filed-rate doctrine because "the tariff itself commands application of the Arbitration Act's standards." *Id.* As set forth in 9 U.S.C. § 3, a court is authorized to stay proceedings pending arbitration, "providing the applicant for the stay is not in default in proceeding with such arbitra-

---

**11.** With regard to the latter point, EPMI argues that the Court has discretion to refuse to lift the automatic stay to allow arbitration to proceed in cases involving core issues if arbitration would frustrate the objectives of the Bankruptcy Code, thereby resulting in an inherent conflict between the Bankruptcy Code and the FAA. The Court will address this argument in turn.

**12.** Section 3 of the Federal Arbitration Act provides that

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
9 U.S.C. § 3.

tion." A determination that a party has waived arbitration is precisely a finding that the party is "in default in proceeding with such arbitration."

 In addition, as between an arbitration panel and a court, a court may reach the issue of whether arbitration has been waived in instances where the claim of waiver is premised upon prior litigation of the same dispute by the party then seeking arbitration. *Doctor's Assocs., Inc. v. Distajo,* F.3d 438, 456 (2d Cir.1995). This applies whenever a party seeking arbitration has engaged in any prior litigation of such dispute in any forum. *Doctor's Assocs., Inc. v. Distajo,* F.3d 438, 456 n. 12 (2d Cir.1995), (citing, *Kramer v. Hammond,* 943 F.2d 176 (2d Cir.1991)). Thus, the Court is the proper forum to determine whether Snohomish has waived its right to exercise the arbitration clause by litigating the state law issues in another forum.

 Snohomish asserts that the Gaming and Partnership Proceeding and the FERC Petition proceeding are police and regulatory in nature and therefore under FERC's exclusive jurisdiction pursuant to the FPA. Snohomish contends that matters within FERC's exclusive regulatory authority are not arbitrable. Snohomish also maintains that because the proceedings at FERC were not arbitrable, any litigation relating to those proceedings could not be the basis of a waiver. Snohomish further asserts that the Court has previously acknowledged the regulatory nature of the Gaming and Partnership Proceeding in decisions it has rendered. Snohomish also cites several decisions that have concluded that FERC may retain jurisdiction over a dispute notwithstanding an arbitration clause in the contract. (e.g., *PacifiCorp. v. Reliant Energy Services, Inc.,* 99 FERC ¶ 61,381 at P 24 (2002), *reh'g denied,* 103 FERC ¶ 61,355 (2003),

*aff'd, PacifiCorp v. FERC,* 9th Cir. No 03–7252).

EPMI contends that even if FERC may arguably have had exclusive jurisdiction over the issues Snohomish raised, that does not affect Snohomish's waiver of its right to arbitration. EPMI maintains that the arbitration clause is broad and applies to "[a]ny claim ... arising out of or relating to this Agreement," whether such claim "sound[s] in contract, tort, or otherwise, at law or in equity, under state or federal law, [and] whether provided by statute or the common law...." Thus, EPMI urges that every issue raised before FERC related to the Master Agreement.

 Where issues before FERC are not arbitrable, any litigation relating to such issues could not be the basis of a waiver. See e.g., *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 862 (2d Cir.1985). However, only rate issues within FERC's exclusive jurisdiction that implicate its area of expertise and its enforcement authority are not arbitrable. *Gulf Oil Corp. v. F.P.C.,* 563 F.2d 588, 597 (3d Cir.1977). Thus, an issue would not be arbitrable if it relates to FERC's independent responsibility, as a regulatory body, to protect the public interest by enforcing filed-rate schedules. *A/S Ivarans Rederi v. United States,* 938 F.2d 1365, 1367–68 (D.C.Cir.1991) (noting that enforcement of rate schedules filed with the agency is "a matter distinctly within the [regulatory agency's] statutory mandate"); *See also, Duke Power Co. v. FERC,* 864 F.2d 823, 830 (D.C.Cir.1989) (noting that it was proper to disregard arbitration clause in contract because energy trader's "violation of the interconnection agreement effectively converted the ... dispute from one between [the energy trader] and complainants to one between [the energy trader] and the [regulatory agency]"). However, when a state law contract issue is before

FERC and the issue does not implicate FERC's exclusive jurisdiction, FERC must consider the applicability of the arbitration clause and any defenses thereto.

Snohomish argues that the Court has already acknowledged that the Gaming and Partnership Proceeding is regulatory in nature and, therefore, within FERC's exclusive jurisdiction. Snohomish further argues that the FERC Petition proceeding, in which a determination is sought that the Termination Payment violates the FPA, is also within FERC's exclusive jurisdiction. Therefore, Snohomish contends that its conduct in these "regulatory proceedings" cannot form the basis of a waiver. Snohomish further argues that its participation in proceedings before FERC under Section 1290 was not inconsistent with its arbitration rights because it was proceeding under the assumption that the amendment had given FERC exclusive jurisdiction over the entire dispute concerning the Termination Payment.

EPMI argues that its contention that Snohomish waived its right to exercise arbitration is not based upon the regulatory aspects of the Gaming and Partnership Proceeding. Rather, EPMI argues that Snohomish systematically tried to infuse into that proceeding issues that formerly had not been part of that regulatory proceeding—issues that related to the Termination Payment state law contractual claims. EPMI contends that the essence of the Request for Clarification was to excuse Snohomish from paying the Termination Payment owed to EPMI. EPMI maintains that it was prejudiced by that action, as Snohomish obtained discovery related to the Termination Payment issues that would not have been available in arbitration. In addition, EPMI contends that Snohomish sought to litigate the state law contract issues in the FERC Petition proceeding, including asking FERC to order EPMI to pay Snohomish a termination payment based upon a calculation reflecting the market movement during an earlier period when Snohomish would have been "in the money." EPMI further argues that even after the District Court Opinion was issued, Snohomish continued to litigate state law contractual issues before FERC by filing the October Petition.

The enactment of Section 1290 provided Snohomish with a defensible basis upon which to conclude that FERC had exclusive jurisdiction over the Termination Payment state law contractual issues. By itself, pursuing relief before FERC that was arguably within its exclusive jurisdiction following the enactment of Section 1290 would not establish waiver of the right to exercise the arbitration clause. However, the cumulative effect of Snohomish's conduct might require the conclusion that Snohomish acted inconsistently with its right to arbitrate the state law contractual issues.

Prior to the enactment of Section 1290 and following the District Court Opinion, Snohomish actively attempted to litigate the state law claims before FERC. Snohomish sought extensive discovery with respect to those issues in the Gaming and Partnership Proceeding and engaged in extensive motion practice before the District Court and Second Circuit. Moreover, after the District Court Opinion was issued, Snohomish filed the October Petition and continued to violate the automatic stay in an effort to litigate the state law Termination Payment issues before FERC and to delay any other forum from addressing those issues.

The Gaming and Partnership Proceeding was commenced in FERC's regulatory capacity. However, through its Request for Clarification, Snohomish introduced certain Termination Payment issues into that proceeding—issues that were not pre-

viously a part of that proceeding. Further, Snohomish conducted discovery—a process that would not ordinarily be available in arbitration—relating to EPMI's Termination Payment claims.

While Snohomish's active participation in pursuing certain conduct was inconsistent with its right to exercise the arbitration clause, "it is not inconsistency but the presence or absence of prejudice which is determinative of the issue of waiver." *Lubrizol Int'l,* 562 F.Supp. at 573. (Citations and internal quotations omitted). Here, EPMI has not shown that it suffered sufficient prejudice to establish waiver of the right to exercise the arbitration clause.

EPMI argues that Snohomish has obtained discovery that it would not have been able to obtain in arbitration. EPMI contends that Snohomish expanded the discovery it sought in the FERC proceeding in order to obtain discovery concerning the central issues involved in the state law Termination Payment claim. Snohomish counters that because of the nature of the proceedings before FERC, involving disgorgement of profits and market manipulation, the discovery sought would tend to overlap to some extent with the discovery concerning the state law Termination Payment issues. Snohomish further argues that discovery properly pursued in those proceedings cannot form the basis for a waiver.

There is no dispute that Snohomish was entitled to the discovery on issues relevant to the Gaming and Partnership Proceeding. Moreover, the fact that discovery properly obtained in that proceeding benefitted Snohomish in another proceeding would not form the basis for a waiver of its right to arbitrate the state law issues. Other than directing the Court's attention to certain lines of inquiry pursued at various hearings and depositions, EPMI has not carried its burden to identify the particular prejudice it suffered as a result of the discovery obtained. Indeed, much of the discovery obtained concerning the Termination Payment related to the issue of profits, which is relevant to the market manipulation and disgorgement of profits issues pending before FERC.

Moreover, with respect to the state law issues concerning the Termination Payment, it does not appear that there is a material dispute concerning the methodology used to calculate it. In that regard, in its publicly disclosed 2004 Annual Report, Snohomish presented its calculation of an amount representing the Termination Payment that was not that different from EPMI's calculation, in relative terms. The real dispute centers on potential state law defenses, primarily fraud, to the enforceability of the contract itself. It is not clear how the discovery obtained related to those defenses.

Further, while EPMI had to seek relief from the Court on several occasions resulting from Snohomish's efforts to bring the Termination Payment issues before FERC, Snohomish had plausible justification for its efforts even if ultimately found to be incorrect. Moreover, with respect to certain of the proceedings, the Court had to analyze whether there were issues involving the FPA that were properly before FERC. As EPMI would have to respond concerning whether certain issues related to the FPA, under the facts, the added burden of addressing the other issues does not constitute the degree of prejudice that would warrant waiver of the arbitration clause.

As previously noted, because of the strong federal presumption preferring arbitration, any uncertainty concerning waiver is resolved in favor of allowing arbitration to proceed. Thus, the Court

concludes that Snohomish has not waived its right to exercise the arbitration clause in the Master Agreement.

EPMI also argues that the Court should not lift the automatic stay to allow Snohomish to proceed with arbitration because core bankruptcy issues are involved in this adversary proceeding. However, even when presented with a core proceeding, a bankruptcy court may not preclude arbitration unless the proceeding is premised on Bankruptcy Code provisions that "inherently conflict" with the FAA or where arbitration would jeopardize objectives of the Bankruptcy Code. *In re United States Lines, Inc. v. American S.S. Owners Mut. Prot. & Indem. Ass'n (In re United States Lines, Inc.),* 197 F.3d 631, 640 (2d Cir.1999). Here, even accepting EPMI's characterizations of the core aspects of this proceeding, pursuing arbitration would not jeopardize objectives of the Bankruptcy Code nor would the Code provisions involved inherently conflict with the FAA.

Here, the Master Agreement includes an arbitration clause signifying the parties intent to send state law contract issues to arbitration. Therefore, even if the proceeding were determined to be core, and even though the amount in issue may be a significant recovery for EPMI, the Court is bound to follow the parties intent to send the matter to arbitration unless the standards of the *United States Lines* case are met. The potential recovery for the estate involved here and the total number of trading cases at issue do not warrant an exception to the federal policy favoring arbitration. While there were approximately 80 trading cases sent to mediation, only a small percentage contained arbitration clauses. More significantly, if the matters had not been sent to mediation, any concerns that the Debtors would have had to deal with a number of arbitration

proceedings while attempting to administer the estate could have been addressed by enforcing the automatic stay until the Debtors were in a position to adequately respond to such a number of litigation forums. In that way, the Debtors would have been provided with a necessary "breathing spell" until such time as an orderly process could have been developed to send the individual adversary proceedings to arbitration without disrupting the Debtors' restructuring. That stage has been reached with respect to this adversary proceeding. Therefore, the Court lifts any injunction provided for under the Plan and Confirmation Order, including the continuation of the automatic stay, to permit the state law contractual issues to proceed to arbitration.

### *Conclusion*

The Court concludes that the doctrine of primary jurisdiction is not implicated because enforcement of a contract is within the competence of a court and not reserved to the particular expertise of FERC. In accordance with the filed-rate doctrine, even after its market-based authority was revoked and in the absence of wind-down authority, EPMI may enforce the Master Agreement using the relevant rates unless and until those rates are set aside by FERC. For the same reasons, the Court does not deem it necessary that a ruling be deferred on interpreting the contractual terms until FERC completes its remedial process.

Further, the Court may properly determine whether Snohomish has waived its right to exercise the arbitration clause in the Master Agreement. Although Snohomish may have engaged in persistent efforts to have FERC address the state law Termination Payment issues, which conduct was inconsistent with exercising the arbitration clause, EPMI has not sufficiently established that it was prejudiced

by Snohomish's efforts. In view of the strong federal policy favoring arbitration, the Court concludes that Snohomish has not waived its right to exercise the arbitration clause. The Court further concludes that, even if characterized as core, the proceeding must be sent to arbitration because pursuing arbitration would not jeopardize objectives of the Bankruptcy Code nor would the Code provisions involved inherently conflict with the FAA.

Based upon the foregoing, the arbitration clause of the Master Agreement must be enforced and the state law contractual issues must be resolved by an arbitrator. The Arbitration Motion is granted and the Adversary Proceeding is dismissed. As a result, the EPMI Summary Judgment Motion and the Snohomish Summary Judgment Motion are no longer before the Court.

Counsel for Snohomish is to settle an order consistent with this opinion.